UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

GOLDEN RING INTERNATIONAL, INC.;
LIVING THE DREAM FILMS, INC.; AND
TRADEMIT LIMITED,

                    Plaintiffs

          -v-                                          6:18-CV-1244

MATHEW CULLEN; and MOTION THEORY,
INC.,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                                OF COUNSEL:

OFFICE OF RAYMOND J. MARKOVICH              RAYMOND J. MARKOVICH, ESQ.
Attorneys for Plaintiffs
351 Westbourne Drive
West Hollywood, CA 90048

VENABLE LLP                                 ALEX M. WEINGARTEN, ESQ.
Attorneys for Defendants
California Office
2049 Century Park East, Suite 2300
Los Angeles, California CA 90067

                                            JEFFREY K. LOGAN, ESQ.

                                            JESSIE F. BEEBER, ESQ.

                                            MATTHEW J. BUSCH, ESQ.

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I.    INTRODUCTION

The production of the film *London Fields* ("the Film") was quarrelsome.  This claim arose out of its many resulting disputes.  Nominally, the claim was brought by plaintiffs Golden Ring International, Inc. ("Golden Ring"), Living the Dream Films, Inc. ("Living the Dream"), and Trademit Limited, formerly known as Blazepoint Limited ("Trademit") against defendants Mathew Cullen ("Cullen") and Motion Theory, Inc ("Motion Theory").  But in a practical sense, the claim was brought by Peter Hoffman (Trademit's owner and controller), Raymond Markovich (Golden Ring's owner and controller), and Living the Dream, against the Film's director, Cullen, who completely controlled the now defunct Motion Theory.

On November 6, 2018, Plaintiffs filed an amended complaint containing their allegations in the Northern District of New York.  In that complaint, they bring four claims for relief: 1) a request for a declaratory judgment that plaintiffs alone own all worldwide distribution rights under copyright in the Film; 2) a claim of trade libel; 3) a claim of tortious interference with contract; and 4) a claim of interference with plaintiffs' economic expectancy.

Defendants did not respond to the amended complaint.  As a result, on January 24, 2019, plaintiffs successfully moved the Clerk of Court for an entry of default.  To this day, plaintiffs have not moved for default judgment.  On March 12, 2019, defendants moved to dismiss the complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure ("Rule") 12(b)(2), and insufficient service of process under Rule 12(b)(5), or, in the alternative, for relief from the entry of default under Rule 55(c).  That motion has been fully briefed, and the Court will now consider it on the basis of the parties' submissions without oral argument.

2

## II.    BACKGROUND

### 1.    Production of the Film and the Los Angeles Litigation.

In April of 2013, Cullen's agent informed him of the opportunity to direct the Film.
Dkt. 25-2 ("Cullen Aff.") ¶ 19.  At some point thereafter, he discussed that opportunity in Los
Angeles with Jordan Gertner and Christopher Hanley, who produced the Film.  *Id.*  Gertner
and Hanley formed Nicola Six Limited ("Nicola Six"), to whom the Film's cast and crew looked
for payment.  *See id.* at ¶ 21 (describing Nicola Six's payment structure for the Film); Dkt. 30
("Markovich Aff.") ¶ 31 (identifying Hanley and Gertner as managers of Nadia Six).  On
September 9, 2013, Nicola Six signed an agreement employing Cullen, through Motion
Theory, to direct the Film.  Dkt. 5-2.  On November 25, 2013, defendants and Nicola Six
signed an additional certificate of engagement for Cullen to direct the Film, vesting all
copyright in Nicola Six.  Dkt. 5-1.

On July 29, 2013, Cullen travelled to London, where the Film was to be shot, and
began work on the Film.  Cullen Aff. ¶ 21.  Principal photography for the film began on
September 9, 2013.  *Id.*  Production of the film was tumultuous, resulting in significant delay,
which Cullen lays in part at Nicola Six's feet for their inability to pay the crew and vendors.
*Id.*; *see* Markovich Aff. ¶ 21.  Nicola Six terminated Cullen on August 15, 2014.  Cullen Aff.
¶ 24.

In response, Cullen sued Nicola Six, and the Film's other producers, in Los Angeles on
September 15, 2015 alleging fraud, misappropriation of name and likeness, and unfair
competition.  Cullen Aff. ¶ 25.  Nicola Six then filed a counterclaim for Cullen's failure to
timely complete the Film.  Markovich Aff. ¶ 21.  Plaintiffs, for their part, contend that Cullen's

3

suit was meritless, and was initiated only to interfere with the investment and distribution rights of the rightful holders of the copyright. Dkt. 5, ¶ 21(A); Markovich Aff. ¶ 27.

### 2. Chain of Rights to the Film and Financing Global Distribution.

In June of 2017, Markovich, sole owner of Golden Ring, presented Hoffman, the owner of Trademit, with an opportunity to purchase a secured loan in the Film from one of the Film's investors. Markovich Aff. ¶ 3. On July 19, 2017, Trademit purchased the loan from the other investor. Dkt. 30-1. The loan was secured by a first-priority security interest in "all of [Nicola Six's] right, title and interest . . . in relation to the Film." *Id.* at 32-33[1]; Markovich Aff. ¶ 3.

Some time later, Nicola Six became insolvent, and Trademit obtained power of attorney over its proceedings under England's Insolvency Act of 1986. Markovich Aff. ¶ 32; Dkt. 30-6. On June 27, 2018, Trademit appointed Lynn Gibson ("Gibson") as administrator of Nicola Six's insolvency proceedings. Dkt. 30-6. Due to Nicola Six's inability to repay the loan, Trademit obtained all rights to "complete control" over the Film pursuant to the security interest they possessed. Markovich Aff. ¶ 4. Trademit then assigned the "right to distribute the [Film] throughout the world" to Picture Pro, LLC—which, like Trademit, is also controlled by Hoffman—and Gap Financing LLC, owned and controlled by Markovich. *Id.* at ¶ 5. Picture Pro, LLC is registered in Colorado. Dkt. 32-14, p. 2. Gap Financing LLC is registered in California. Dkt. 32-19, p. 2.

At around the same time, plaintiffs allege that Picture Pro and Gap Financing negotiated a distribution license for the Film with Buena Vista International for an international release. Markovich Aff. ¶ 6. Plaintiffs further allege that this license would have generated "$3,500,000 of guaranteed receipts." *Id.* Buena Vista advised Picture Pro that it would not proceed with the license while lawsuits lingered around the Film's production, including Cullen's Los Angeles suit. *Id.*

---

[1] Pagination corresponds with CM/ECF.

4

On January 1, 2018, Picture Pro and Gap Financing assigned their "rights to control distribution" to Golden Ring, also owned and controlled entirely by Markovich. Markovich Aff. ¶¶ 1, 10. On August 26, 2018, Trademit granted a security interest in the Film's distribution report to plaintiff Living the Dream to secure a $750,000 loan, which Trademit used to finance distribution. *Id.* at ¶ 10. Plaintiffs contend that the transfer of rights to Golden Ring was to "further secure [Trademit]," and to ensure that "the location and situs of the copyright for[,] in[,] and to the Picture in the United States was the State of New York, the principal place of business of" Living the Dream.[2] *Id.* at ¶ 10.

All told, in August of 2018, Hoffman held an interest in the distribution rights to the Film through Trademit, Markovich held an interest in the distribution rights through Golden Ring, and Trademit owed a loan to Living the Dream secured by the Film's distribution report. Despite the numerous changes in ownership, however, throughout the entire period from July 19, 2017 to the present, Hoffman and Markovich have personally remained in control of the rights to the Film, subject only to Living the Dream's security interest.

### 3. Release of the Film and Settlement Negotiations for the Los Angeles Suit.

Now in possession of the rights to the Film and the funding to distribute it, Golden Ring turned their attention to the two remaining obstacles to release: Cullen's suit in Los Angeles, and the lack of a completed cut of the film.

As to the first obstacle, Markovich and Hoffman "believed it necessary and appropriate to settle the disputes with Cullen and to complete the [Film] in cooperation with him," even should it require dismissing Nadia Six's counterclaim. Markovich Aff. ¶ 27. At the same time, however, Hoffman "engaged a professional editor" to begin work on assembling footage to complete the Film. *Id.* at ¶ 30.

---

[2] The Court notes, however, that Trademit is incorporated in Cyprus, not New York, and that the transfer of rights to Golden Ring occurred a full seven months before Trademit secured the loan from Living the Dream. Markovich Aff. ¶¶ 2, 9-10.

Settlement negotiations and attempts to include Cullen in finishing the Film began on August 15, 2017. Markovich Aff. at ¶ 34. Plaintiffs allege that Cullen was difficult to reach and only intermittently responsive to overtures by Hoffman. *Id.* Given Cullen's silence, Hoffman and Markovich decided to permit their retained editor to finish the Film. *Id.* at ¶ 36.

Settlement negotiations were somewhat more fruitful, however. *See* Cullen Aff. ¶ 32. Cullen met with Hoffman for the first time on December 14, 2017 to discuss settling the Los Angeles suit. *Id.* Subsequently, Cullen, Hoffman, Markovich, Hanley, Gertner, and, after Nicola Six's insolvency, Gibson, met occasionally over the following months. *Id.* As one of his proposals for settlement, Cullen suggested that he receive funding to finish his own cut of the Film, which could be released alongside the cut already produced by Hoffman and Markovich ("the distributor's cut"). *Id.* at ¶ 33. Plaintiffs, however, contend that Cullen insisted that he would refuse to work with any other professionals to finish the film. Markovich Aff. ¶ 39.

As settlement negotiations continued, Hoffman and Markovich's retained editor delivered the finished distributor's cut. Markovich Aff. ¶ 36. The distributor's cut debuted in Russia on September 20, 2018. Cullen Aff. ¶ 34. Then, on October 26, 2018, plaintiffs released the Film in 610 theaters in the United States, including 50 in New York. Markovich Aff. ¶ 11. The Film failed critically and financially. *Id.* Cullen had refused to publicize the Film. *Id.*; *see* Cullen Aff. ¶ 26. Additionally, plaintiffs allege that Cullen had threatened to enjoin the release of the distributor's cut, which Cullen denies. *Compare* Cullen Aff. ¶ 35 (denying threatening to enjoin the Film), *with* Markovich Aff. ¶ 48 (alleging that Cullen threatened to enjoin the Film). Plaintiffs contend that Cullen's interference in these matters resulted in the Film's failure. Markovich Aff. ¶ 11. In any event, in the face of Cullen's

ongoing suit in Los Angeles, Buena Vista withdrew from negotiations with Markovich and Hoffman, and any potential revenue from that prospective deal vanished.  *Id.* at ¶ 50.

In the immediate aftermath of the Film's release, Cullen gave an interview with the *Hollywood Reporter* which that website published on October 31, 2018.  Dkt. 25-12, p. 2. Regarding the Film's reception, Cullen stated: "I've read the reviews.  I agree with them."  *Id.* at p. 3.  He also noted that "[t]here's a reason why they said that [the book from which the Film was adapted] was unadaptable[.]"  *Id.* at p. 4.  Finally, Cullen described his thought process in wanting to produce his own cut of the film, and in deciding to maintain his directing credit for the Film instead of receiving the credit under a pseudonym.  *Id.* at p. 5.

Following the release of the *Hollywood Reporter* interview, Markovich and Hoffman terminated all settlement negotiations with Cullen.  Markovich Aff. ¶¶ 52-53.  The remaining parties, however, agreed to settle the Los Angeles suit with Cullen.  *See generally* Dkt. 25-3. Those parties signed a settlement agreement which took effect on November 8, 2018.  *Id.*  As part of that agreement, Cullen obtained the rights to edit and release his own cut of the film ("the director's cut").  *Id.* at § 2.  At around this time, Cullen completed the director's cut, which was released on October 26, 2018.[3]  *Id.* at § 2.4; Cullen Aff. ¶ 38.

### 4.  Procedural History of the Present Claim.

Unsatisfied with the settlement negotiations and the state of the matter between themselves and Cullen, plaintiffs filed this suit on October 19, 2018.  Dkt. 1.  Plaintiffs chose to bring the suit in the Northern District of New York.  *Id.*

Cullen alleges that he worked in the State of New York only three times throughout his career.  Cullen Aff. ¶ 13.  He further alleges that he did no Film business in New York; instead, all of his Film business occurred in California and London.  *Id.* at ¶ 6.  Similarly,

---

[3] The agreement, although signed on November 8, 2018, nevertheless scheduled the cut's release for October 26 of the same year.  *See* Dkt. 25-3, § 2.4.

Cullen states that Motion Theory has never had any office in New York, no Motion Theory employees resided in New York during production of the Film, and Motion Theory did not perform any services for the Film in New York. *Id.* at ¶¶ 9-11. Cullen has resided in California for his entire life, and Motion Theory was incorporated in California, where it also had its principal place of business. *Id.* at ¶¶ 2, 9. On October 23, 2018, Cullen first learned that plaintiffs had filed this lawsuit from an internet article. *Id.* at ¶ 15.

On November 6, 2018, plaintiffs filed an amended complaint including defendants' subsequent conduct, especially the *Hollywood Reporter* interview. Dkt. 5. On November 19, 2018, plaintiffs, through a California process server, first attempted to serve Cullen at 8916 Rayford Drive, Westchester, California 90045 ("Rayford property"). Dkt. 7, p. 4. No one answered the server. *Id.*

The server next attempted to serve Motion Theory, first at the listed address of its registered agent, Eric Feig. Dkt. 8-2, pp. 2-3. The security officer at the front desk informed the server that Feig had left the building six months ago with no forwarding address. *Id.* Next, the server attempted to serve Motion Theory that same day at its listed business address, 4235 Redwood Avenue, Los Angeles, CA 90086 ("Redwood property"). Dkt. 7, pp. 3-4. An employee of the Redwood property informed the server that Motion Theory no longer resided at that address.[4] *Id.*

The server then returned to the Rayford property, where a landscaper told the server that the occupants would return the next week. *Id.* at p. 4. On November 27, the server unsuccessfully tried to serve the Rayford property again. *Id.* Finally, on December 2, 2018, a woman who the server believed to be Suzanne Cullen, Cullen's wife, answered the door. *Id.* at p. 5. The woman declared "never heard of them" when asked about Motion Theory, and

---

[4] According to Cullen, Motion Theory moved out of the Redwood property in December 2016, when Motion Theory closed its offices before its business entered general assignment on January 2, 2017. Cullen Aff. ¶¶ 3, 17.

slammed the door.  *Id.*  The server announced loudly that she was serving the woman on behalf of Cullen, left the documents on the doormat, and mailed the documents to the Rayford property.[5]  *Id.*

Having entirely failed to serve Motion Theory, plaintiffs moved for substitute service on December 11, 2018.  Dkt. 8.  United States Magistrate Judge Andrew Baxter granted that motion on December 13, 2018, and allowed for service on Motion Theory through service on the California Secretary of State.  Dkt. 9.  On December 27, 2018, plaintiffs served Gregory Buford, Deputy Secretary of State of California, in compliance with Judge Baxter's order. Dkt. 10.

Content that they had served both defendants, and that neither had responded, plaintiffs requested entry of default as to Cullen on January 2, 2019.  Dkt. 12.  The Clerk entered default against him on January 4.  Dkt. 14.  Plaintiffs then requested an entry of default as to Motion Theory on January 24, 2019.  Dkt. 19.  The Clerk entered default against Motion Theory on January 25.  Dkt. 20.  Plaintiffs never subsequently moved for default judgment against either defendant.

On March 12, 2019, defendants moved to dismiss the complaint for lack of personal jurisdiction and insufficient service of process, or in the alternative for relief from the entry of default.  Dkt. 25.  In that motion, Cullen alleges that he and Motion theory never responded to plaintiffs' complaint because Cullen had been unaware that plaintiffs had attempted service until Gibson informed him of the entry of default.  Cullen Aff. ¶ 15.  Plaintiffs opposed the motion on March 26, 2019, which was supported by the Markovich Affidavit and certain other

---

[5] The Rayford property remained in Cullen's name until January 2019, but Cullen affirms that he had moved out of the property in 2012 due to his fraught relationship with his then-wife.  Cullen Aff. ¶ 16.  Cullen further holds that his name remained on the title as part of an agreement with his former wife, under which he agreed to make mortgage payments on the home during their separation, and he has subsequently transferred the property entirely to his wife on conclusion of divorce proceedings.  *Id.*

9

exhibits on March 27, 2019.[6]  Dkt. Nos. 29; 30.  Defendants replied to plaintiffs' opposition on April 1, 2019.  Dkt. 32.

### III.    **LEGAL STANDARD**

In opposing a motion to dismiss under Rule 12(b)(2), the plaintiff bears the burden of establishing a proper basis for personal jurisdiction over the defendant. *Nat'l Elec. Sys., Inc. v. City of Anderson*, 601 F. Supp. 2d 495, 497 (N.D.N.Y. 2009) (citing *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 784 (2d Cir. 1999)).

Even where plaintiffs have attained a full default judgment, "plaintiffs retain the burden of proving personal jurisdiction, [which] they can satisfy . . . with a prima facie showing, and may rest their argument on their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain."  *NYKCool A.B. v. Pac. Int'l Servs., Inc.*, 66 F. Supp. 3d 385, 392 (S.D.N.Y. 2014).  In all other circumstances prior to discovery or an evidentiary hearing, the plaintiff need only "allege facts constituting a prima facie showing of personal jurisdiction." *Nat'l Elec. Sys.*, 601 F. Supp. 2d at 497 (citing *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1106 (2d Cir.1997)).  At this early stage, all pleadings and factual ambiguities are construed in favor of the plaintiff.  *Id.* (citing *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994)).

However, courts "will not draw argumentative inferences in the plaintiff's favor . . . nor . . . accept as true a legal conclusion couched as a factual allegation[.]"  *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (internal citations and quotation marks omitted).  Moreover, on a motion to dismiss pursuant to Rule 12(b)(2),

---

[6] The Court notes, as defendants point out in their reply, that plaintiffs filed their affidavit and exhibits after the Court's imposed deadline of March 26, 2019.  *See* Text order dated March 12, 2019.  Given the complexity of the facts in this case, and the light the affidavit shines on the nature of the plaintiffs and their rights to the Film, the Court will nevertheless consider plaintiffs' full submission, although it could have declined to do so.  Local Rule 7.1(b)(3).  Regarding defendants' evidentiary objections to the Markovich affidavit, the Court used both affidavits solely to the extent necessary to establish the factual record of the case. Dkt. 32 p. 6 n.1.  As discussed below, the Court need not, and did not, consider plaintiffs' conclusions and opinions, and the Court did not rely on any hearsay contained in the affidavit.

courts may consider materials outside the pleadings "without converting [the] motion to dismiss for lack of personal jurisdiction into a motion for summary judgment." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013).

The Court consider must consider whether plaintiffs have made "legally sufficient allegations of jurisdiction," including "an averment of facts that, if credited[,] would suffice to establish jurisdiction over the defendant." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34-35 (2d Cir. 2010) (alterations in original) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003)).

## IV. THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS.

### 1. The Court's ability to consider jurisdiction after defendants' default.

Even a full "default judgment is 'void' if it is rendered by a court that lacks jurisdiction over the parties." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 138 (2d Cir. 2011). In fact, in the context of default, even where personal jurisdiction has not been raised by the parties, a court "may first assure itself that it has personal jurisdiction over the defendant[.]" *Sinoying Logistics Pte Ltd. v. Yi Da Xin Trading Corp.*, 619 F.3d 207, 213 (2d Cir. 2010).

On defendants' motion, however, it becomes the court's duty to consider whether it has personal jurisdiction over the defendants. *See Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 153 (2d Cir. 1999) (remanding default judgment because district court failed to adequately conduct personal jurisdiction analysis for defendants' Rule 12(b)(2) motion); *see also Mickalis*, 645 F.3d at 136 n.22 (citing *Credit Lyonnais* for the proposition that a district court is "bound to inquire into personal jurisdiction before entering judgment").

As such, the Court may look to defendants' motion to dismiss despite the entry of default and without considering whether to grant defendants' motion for relief from default.

*Credit Lyonnais*, 183 F.3d at 153; *see MJC Supply, LLC v. Powis*, 2019 WL 1429625, at *5 (E.D.N.Y. Mar. 29, 2019) (dismissing complaint *sua sponte* after entry of default for lack of personal jurisdiction).

Plaintiffs contend, however, that the entry of default conclusively established against defendants the allegations of personal jurisdiction in the complaint. Dkt. 29, p. 3. In so doing, plaintiffs read too much into the rule that "a court accepts as true all well pleaded allegations against a defaulting defendant *for purposes of determining liability*[.]" *Finkel v. Romanowicz*, 577 F.3d 79, 83 n.6 (2d Cir. 2009) (emphasis added) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992)). Rather, the Court is not bound to accept plaintiffs' legal conclusion that this Court has personal jurisdiction over defendants. *In re Terrorist Attacks*, 714 F.3d at 673. Moreover, even in the face of a full default judgment, "plaintiffs retain the burden of proving personal jurisdiction[.]" *NYKCool*, 66 F. Supp. 3d at 392. Plaintiffs cannot plead that burden away.

Plaintiffs also argue that the entry of default resulted in defendants' waiver of their rights to challenge personal jurisdiction. Dkt. 29 pp. 16-17. Contrary to plaintiffs' assertions, however, personal jurisdiction is waived "when a defendant has appeared and consented, voluntarily or not, to the jurisdiction of the court," or else "by failing timely to raise the defense *in its initial responsive pleading*." *Mickalis*, 645 F.3d at 133 n.22, 134 (emphasis added) (citing Fed. R. Civ. P. 12(h)). Defendants' first pleading was the present motion, so defendants did not waive their defense of a lack of personal jurisdiction. *See, e.g.*, *Credit Lyonnais*, 183 F.3d at 153 (mandating that courts consider Rule 12(b)(2) motion brought for the first time after entry of default).

Accordingly, the Court will proceed to examine its jurisdiction over defendants.

12

## 2. **Does New York's long arm statute reach defendants.**

Absent directives from federal law, "federal courts are to apply the personal jurisdiction rules of the forum state[.]" *Penguin Grp.*, 609 F.3d at 35. New York's statute governing personal jurisdiction for foreign defendants is N.Y. C.P.L.R. § 302. The plaintiff must prove five elements to establish jurisdiction under § 302(a)(3)(ii): "(1) the defendant committed a tortious act outside the state; (2) the cause of action arose from that act; (3) the act caused injury to a person or property within the state; (4) the defendant expected or should reasonably have expected the act to have consequences in the state; [and] (5) the defendant derives substantial revenue from interstate or international commerce." *Solé Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 106 (2d Cir. 2006) (citing *LaMarca v. Pak-Mor Mfg. Co.*, 735 N.E.2d 883, 886 (N.Y. 2000)).

However, by the statute's plain language, plaintiffs cannot satisfy § 302(a)(3) if the tort they rely on for jurisdiction is a "cause[] of action for defamation of character . . . ." A cause of action for defamation of character includes other causes of action, such as trade libel and interference with expected profits, so long as the entire complaint sounds in defamation. *Cantor Fitzgerald, L.P. v. Peaslee*, 88 F.3d 152, 157 (2d Cir. 1996) (noting that claims of injurious falsehood and tortious interference with prospective economic advantage "do not independently establish personal jurisdiction . . . because the entire complaint sounds in defamation"). "Courts must look to the substance, not merely the name, of a claim in order to determine whether that claim sounds in defamation." *Mosry v. Pal-Tech, Inc.*, 2008 WL 3200165, at *5 (S.D.N.Y. Aug. 7, 2008).

Regarding the third element of whether the act caused injury to a person or property within the state, courts must conduct a "situs-of-injury" inquiry. *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 171 F.3d 779, 791 (2d Cir. 1999); *see Penguin Grp.*, 609 F.3d

at 32 (certifying situs of injury question to New York Court of Appeals to determine validity of § 302(a)(3) jurisdiction).  The critical inquiry for situs-of-injury questions is "where the first effect of the tort was located that ultimately produced the final economic injury."  *Cont'l Indus. Grp., Inc. v. Equate Petrochemical Co.*, 586 F. App'x 768, 771 (2d Cir. 2014) (summary order) (citing *Bank Brussels*, 171 F.3d at 792).

In commercial torts, the first effect typically contemplates the location of the loss of income.  *Am. Eutectic Welding Alloys Sales Co. v. Dytron Alloys Corp.*, 439 F.2d 428, 433 (2d Cir. 1971).  That said, even where economic loss is experienced in New York, "[t]he occurrence of financial consequences in New York due to the fortuitous location of plaintiffs in New York is not a sufficient basis for jurisdiction under § 302(a)(3) where the underlying events took place outside New York."  *Pincione v. D'Alfonso*, 506 F. App'x 22, 26 (2d Cir. 2012) (summary order) (alterations in original) (citing *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001)).

Similarly, in cases sounding in copyright, it is insufficient for a plaintiff to rely exclusively on the domicile of the plaintiff copyright holder to attain personal jurisdiction over the defendant.  *See Troma Entm't Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 220 (2d Cir. 2013); *but see Penguin Grp. (USA) Inc. v. Am. Buddha* ("*Penguin Grp. II*"), 640 F.3d 497, 500 (2d Cir. 2011) (noting that New York Court of Appeals on certification from Second Circuit made expressly limited ruling that in "copyright infringement cases *involving the uploading of a copyrighted printed literary work onto the Internet* . . . a New York copyright owner alleging infringement sustains an in-state injury pursuant to CPLR [§] 302(a)(3)(ii)" (emphasis added)).  Instead, the plaintiff must "allege facts demonstrating a non-speculative and direct New York-based injury to its intellectual property rights . . . ."  *Troma*, 729 F.3d at 220 (ruling

that usurping licensing agreements in Germany of a New York-based copyright was insufficient to vest personal jurisdiction in New York).

Plaintiffs have not alleged sufficient facts to constitute a New York-based injury. Plaintiff presents the following as the "wrongful means" which have precipitated the current claim:  1) Cullen's filing of the Los Angeles suit; 2) Cullen's alleged refusal to complete and release the Film with Nadia Six, for which Nadia Six filed a counterclaim on November 17, 2015; 3) Cullen's alleged threat to enjoin or interfere with distribution of the Film over the phone between January 1, 2018 and the filing of the complaint; 4) Cullen's alleged demand for rights to a final cut of the Film; 5) Cullen's failure to publicize and support the release of the Film; and 6) Cullen's allegedly disparaging comments to the *Hollywood Reporter* as published on October 31, 2018.  Dkt. No. 5, ¶ 21.

Plaintiffs rest their arguments in favor of the propriety of this Court's jurisdiction on Golden Ring's possession of the copyright in New York, and their estimate that nine percent of the revenue that they allege to have lost because of Cullen's misconduct came from New York.  Plaintiffs' arguments fail.

First, *Troma*, rather than *Penguin Grp. II*, controls this case.  *Penguin Grp. II* was by design limited to:  1) infringement cases; 2) involving the uploading of a copyrighted printed literary work onto the Internet.  640 F.3d at 500.  Indeed, the Second Circuit first certified the case under a broader question of whether the situs of a copyright infringement suit was the domicile of the copyright holder, and the New York Court of Appeals intentionally limited their answer to only the specific type of infringement alleged.  *Id*. at 499-500.  Accordingly, *Penguin Grp. II* should be read narrowly, and does not apply to this case, which involves no claims of infringement at all, and certainly does not involve a printed literary work.  *Id.*; *see*

*Troma*, 729 F.3d at 220 (discussing *Penguin II* and deciding against expanding its holding beyond its facts).

The Court is bound by *Troma*, which requires facts demonstrating a "non-speculative and direct New York-based injury" to its rights. *Id.* Plaintiffs present none. The only alleged "wrongful means" that could possibly demonstrate a direct injury are those occurring after January 1, 2018, when Markovich and Hoffman transferred their copyrights in the Film from Gap Financing and Picture Pro, respectively, to Markovich's Golden Ring company, at which point the copyright entered New York for the first time. *See* Markovich Aff. ¶¶ 1, 10. This removes from consideration plaintiffs' alleged wrongful means stemming from the Los Angeles action, which Cullen filed in September 2015. Cullen Aff. ¶ 25.

The timing of Golden Ring's reception of rights to the Film also precludes the Court's consideration of any interference with plaintiffs' negotiations with Buena Vista, which began around the time that Hoffman and Markovich gained an interest in the Film, several months before they transferred their rights to Golden Ring. Markovich Aff. ¶ 6. Second, plaintiffs' claims arising from the *Hollywood Reporter* article and their other disparagement claims, relying as they do on an allegedly harmfully false statement, sound in defamation, and therefore also cannot confer jurisdiction under § 302(a)(3). *See Cantor Fitzgerald*, 88 F.3d at 157.

This leaves plaintiffs only with Cullen's alleged threats to enjoin the Film, his alleged demands for the rights to a final cut of the Film, and his alleged refusal to publicize the film as the sole tortious acts that could have New York as their situs. Golden Ring's domicile in New York and New York's representation of nine percent of the alleged total revenue lost by plaintiffs are insufficient to meet plaintiffs' burden of proving legally sufficient allegations of

jurisdiction, because the Second Circuit has expressly ruled that holding the copyright in New York without more is insufficient. *Troma*, 729 F.3d at 220.

Similarly, to the extent that the complaint can be construed as a commercial tort claim, rather than a copyright claim, plaintiffs' allegations of nine percent lost revenue are merely financial consequences located in New York, which the Second Circuit has similarly held to be insufficient to confer personal jurisdiction, even when coupled with plaintiffs' domicile in New York. *Pincione*, 506 F. App'x at 26. In short, under either construction of the claim—copyright or commercial tort—plaintiffs have not demonstrated any direct injury in New York. Based on plaintiff's submissions there is no evidence that Cullen signed any contracts in New York or contemplated any business interest in New York. Indeed, plaintiffs have failed to allege that Cullen so much as dialed a New York phone number in the entire course of his interactions with them.

Accordingly, for the foregoing reasons, plaintiffs have failed to provide legally sufficient allegations to vest jurisdiction in New York, because they have not demonstrated a "direct New York-based injury to [their] intellectual property rights," or more than the mere existence of financial injury that happened to occur in New York. *Troma*, 729 F.3d at 220; *Pincione*, 506 F. App'x at 26. As a result, on this basis alone the Court finds that plaintiffs' complaint merits dismissal. *Troma*, 729 F.3d at 220 (dismissing complaint for lack of personal jurisdiction because plaintiffs could not demonstrate direct injury).

### 3. Would jurisdiction in New York comport with due process.

However, the claim also merits dismissal because finding personal jurisdiction in this Court would violate defendants' due process rights. It is not enough that statutory authority exists to bring the defendant within the forum's authority, because even where the long-arm statute of a state permits personal jurisdiction, due process places additional restrictions on

the ability of a court to reach a defendant.  *See Penguin Grp.*, 609 F.3d at 34-35 (noting that forum state's personal jurisdiction rules apply "provided that those rules are consistent with the requirements of Due Process").

In some cases, a defendant's general contacts with the forum state will be sufficiently extensive to grant a court general jurisdiction over any case regarding that defendant, even if it is unrelated to those contacts.  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Bristol-Meyers Squibb Co. v. Superior Court of California*, 137 S. Ct. 1773, 1780 (2017).  Otherwise, the plaintiff must establish that specific jurisdiction exists because the suit arises out of or is related to the defendant's minimum contacts with the forum state.  *Id.*; *Metro Life Ins. Co.*, 84 F.3d at 567-68.

To satisfy due process in the specific jurisdiction analysis, plaintiffs must first demonstrate that defendant has sufficient "minimum contacts with [the forum state] such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945) (citations and quotation marks omitted).  It is "insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *U.S. Bank Nat'l Assoc. v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019). "Nor is it sufficient for a plaintiff to show simply that a defendant's actions caused an 'effect' in the forum state where the defendant has not expressly aimed its conduct at the forum." *Id.* at 151 (internal citations and quotation marks omitted).

If plaintiffs make that showing, as the second step in the personal jurisdiction analysis, plaintiffs must demonstrate that "the litigation results from alleged injuries that 'arise out of or

relate to' those activities." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Finally, for the third step, the Court "considers those contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *U.S. Bank*, 916 F.3d at 151 (internal citations and quotation marks omitted). Those factors include "the interests of the forum State and of the plaintiff in proceeding with the cause in the plaintiff's forum of choice." *Bristol-Meyers Squibb*, 137 S. Ct. at 1780. However, the primary concern is the burden on the defendant. *Id.*

In this case, neither defendant is domiciled in New York, nor can either defendant be said to do such extensive business in New York as to effectively be "at home" in this state. *Bristol Meyers Squibb*, 137 S. Ct. at 1780; *see* Cullen Aff. ¶¶ 5, 9. Similarly, plaintiffs can establish neither that defendants have the requisite minimum contacts with New York, nor that it would be reasonable for the Court to exercise jurisdiction over them. Cullen's contacts with New York are below the minimal required, because he affirms that he has worked in New York only three times throughout his career, and none of them involved the Film. Cullen Aff. ¶¶ 6, 13.

Similarly, Motion Theory has almost no contacts with New York, being incorporated in California, having never had an office in New York, never engaged in any business in New York related to the Film, and, most critically of all, having dissolved in January 2, 2017, almost a year to the day before any plaintiff held an interest in the Film in New York. *Compare* Cullen Aff. ¶¶ 9-11 (affirming that Motion Theory closed on January 2, 2017) *with* Markovich Aff, ¶ 10 (affirming that plaintiff Golden Ring, the first party domiciled in New York, attained an interest in the Film on January 1, 2018).

Plaintiffs have made no allegations whatsoever as to purposeful contacts on defendants' part with the State of New York. *See generally* Dkt. 29. Instead, plaintiffs rely on

the holding of the copyright in New York by Golden Ring and Living the Dream's secured loan, both of which are the result of plaintiffs' "unilateral activity" and are far removed from any of defendants' interactions with the Film. *U.S. Bank*, 916 F.3d at 150; Markovich Aff. ¶¶ 8-10. Plaintiffs have therefore failed to meet their burden of presenting legally sufficient allegations that defendants' minimum contacts with New York provide this Court with jurisdiction over them without infringing defendants' due process rights. *Penguin Grp.*, 609 F.3d at 34-35.

Plaintiffs have similarly failed to establish that enforcing such jurisdiction would be reasonable. The burden on defendants—the primary concern of the reasonableness analysis—of having to litigate this claim all the way from California would be immense, especially given the dearth of contacts justifying jurisdiction. *Bristol-Meyers Squibb*, 137 S. Ct. at 1780. New York's interest in adjudicating this case is also minimal, because its sole interest comes from Markovich and Hoffman's unilateral decision to transfer the copyright interest from companies they own which are domiciled in other states to Golden Ring. Markovich Aff. ¶ 10. Indeed, the rights to the Film have reached New York only by travelling through London, then Cyprus, then California and Colorado, before finally reaching New York.

New York's interest in Living the Dream's security interest, having been executed in New York, is stronger, but not sufficiently so as to overpower defendants' burden. Plaintiffs' interest in obtaining convenient and effective relief, combined with Living the Dream's security interest, is insufficient to justify submitting defendants to the power of the courts of a state thousands of miles from their home, and with which they have in no way chosen to associate.

Accordingly, because plaintiffs have not met their burden of establishing that defendants could be made subject to suit in New York without violating their due process rights, the claim must be dismissed.[7]

## V.   **CONCLUSION**

The contention between plaintiffs and defendants is palpable, and in need of resolution.  But not here.[8]  This Court remains bound by the jurisdictional principles which empower and limit it.  It is not the whims of the parties, but the authority of Congress and Constitution that gives this Court its force.  Plaintiffs cannot will jurisdiction into existence by manipulating which of their own companies holds title.  Without jurisdiction, this Court cannot, of course, decide the claim.  Accordingly, the claim must be dismissed without prejudice.

Therefore, it is

ORDERED that

1.  Defendants' motion to dismiss is GRANTED; and

2.  The amended complaint is DISMISSED WITHOUT PREJUDICE.

IT IS SO ORDERED.


David N. Hurd
U.S. District Judge

Dated:  August  26, 2019
            Utica, New York.


The Clerk of Court is directed to enter judgment accordingly and close the file.

---

[7] Because plaintiffs' claim merits dismissal based on defendants' personal jurisdiction arguments alone, the Court need not reach defendants' arguments as to the impropriety of service or relief from entry of default.  Dkt. No. 25-1 pp. 21-32.
[8] And neither party has requested a transfer to California.